HARE *v.* BOARD OF EDUCATION.

---

JAMES R. HARE v. THE BOARD OF EDUCATION OF GATES COUNTY.

*Admission to Schools— White and Colored Children—Prohibited Degrees—Negro Blood—Evidence.*

1. The statute (section 42, chapter 199, Acts of 1889) relating to the admission of children into white or colored schools provides that the rule laid down in section 1810 of *The Code*, regulating marriages, shall be followed.  By said section of *The Code* the intermarriage of whites with persons who are not beyond the third or in the fourth generation from the pure negro ancestor is prohibited.  Therefore, a child whose great-grandparent was a negro of full blood is not entitled to admission into a school for whites.

2. Where, in the trial of an action for a *mandamus* to compel a school committee to admit a child into a school for whites, it became material to ascertain whether the grandfather of a child was a negro or a white man, testimony was admissible to show that the grandmother of the child was living with a negro about nine months before the birth of the child's father.

3. While in doubtful cases only an expert would be qualified to testify, from the appearance of a person, as to the exact proportions in which white and negro blood are intermingled in his veins, it is competent to show, by other than expert testimony and by the appearance of a person, his color and other physical qualities, that such person's parent was a negro of full blood.

CIVIL ACTION for a writ of *mandamus* to compel the Board of Education of Gates County to admit plaintiff's children to the school for white children of his district, tried before *Bynum, J.*, and a jury, at Spring Term, 1893, of GATES Superior Court.

The defendants refused to admit the children, upon the ground that the children were negroes and not entitled to be placed on the school list.

It was admitted that the mother of the plaintiff was a pureblood white woman, and that his wife to whom he was married, and who was the mother of his children, was a pureblood white woman; that the plaintiff was an illegitimate child. There was evidence, not contradicted, that the children were within the school age.

J. H. Ellis, a witness for the defendants, testified as follows: "I am eighty-eight years old." (Proposes to ask witness where the mother of plaintiff was living about nine months before plaintiff was born. Objection; overruled, and exception.) Witness answers: "She was living with Charles Jones." Witness further testified he had known the plaintiff from the time he was born until he was twenty-one years old. (Proposes to ask witness, "From your knowledge of the plaintiff, from your observation of him and his associations, do you say he is a white man or a negro?" Objection; overruled,

and exception.) Witness answers: "I say he is a colored man. He associated with colored people until they would not have him."

Upon cross-examination witness said: "Jennie Hare, a white woman, was plaintiff's mother. Charles Jones was not a white man—was a yellow man. Charles Jones's mother was a white woman—Polly Wiggins. His father was a negro."

Morgan, a witness for defendants, testified he had known plaintiff all his life. "From my knowledge of him I say he is a colored man. He has associated with the colored race.",

Upon cross-examination, says he (witness) and Matthews were accused of being the father of plaintiff; that both he and Matthews were white.

William Eason, a colored man, witness for defendants, testified: "I have known plaintiff for twenty-six years. He is a colored man. He associated with colored people; was at our church at the mourners bench for a week. He courted my wife; she is a colored woman. She and I were slaves."

The defendants introduced the plaintiff before the jury for their inspection.

One Jones, a witness for the plaintiff, testified he knew Charles Jones and Elbert Matthews; that Matthews was a white man, dark-colored; that Jones was a colored man, about three-fourths white; that his (Jones's) mother was a white woman; his father a colored man.

One Matthews, a witness for the plaintiff, testified: "I knew the plaintiff's mother; was present when she swore him. She swore him to Elbert Matthews, a white man. This was before the plaintiff was born. Matthews ran away, and after plaintiff was born and he found he was a colored child, he came back."

The plaintiff was introduced as a witness in his own behalf, and testified that the children were his and his wife's; that his wife was a white woman; that twenty-five years ago, when

he went to get married, his mother told him Elbert Matthews was his father.

Upon cross-examination, says he has his two oldest children in Court, and has two at home. The two at home are darker than the ones he has in Court; that they are not as dark as he is.

Plaintiff then introduced before the jury for their inspection the two children.

Upon the conclusion of the evidence the defendants agreed that the second and third issues, relating to alleged demands upon the Board, should be answered Yes, and the fourth issue, as to whether the matter in controversy had theretofore been decided, should be answered No; and that the only issue to be left to the jury should be the first.

The plaintiff's counsel asked, in writing, the following instructions:

" That if they believe the evidence in this case, then the children of James R. Hare are not within the prohibited degrees, and are entitled to be placed upon the school list for District No. 15 of the white race in Gates County, and the jury must answer the first issue Yes."

The Court refused these instructions, and instructed the jury as follows:

" Under the North Carolina laws the marriage between whites and blacks is prohibited within the third degree, but the marriage of whites with persons of color beyond the third degree is allowed, and the children of this marriage, or children within the third degree of children born as a result of this marriage, are white children, and entitled to all the rights and privileges of white children. The question for the jury in this case is whether the children of the plaintiff come within this class. When a plaintiff comes into Court the burden is upon him to show the facts necessary to prove his case. It is admitted that the mother of the plaintiff was white, and that the mother of his children is white. So you

need not follow the line of his ancestors on his mother's side. The only two names suggested in the evidence or argued by counsel as the father of the plaintiff are Elbert Matthews and Charles Jones. It being admitted he is an illegitimate child, there is no presumption arising as to who is his father. That Elbert Matthews was a white man is not denied, and if you find that Matthews was the father of the plaintiff, I instruct you to answer the first issue Yes. It is not denied that the mother of Charles Jones was a white woman. Now, if you find that Jones was the father of the plaintiff—it becomes material to find who his father was—if you find that Jones was the father, Jones's mother being a white woman, and you find that Jones's father was a full-blood negro, then the children of the plaintiff would be within the prohibited degree, and you will answer the issue No. If Jones's father was only a half-blood negro, then this would make Jones three-fourths white, and that will make the children of the plaintiff white, and you will answer the issue Yes. If you find that neither Jones or Matthews was the father of the plaintiff, then the question for you is, In what degree was the father of plaintiff? And in passing on this question you can consider the appearance of the plaintiff, the appearance of his children, the testimony of the witnesses who have testified as to his being white or black; and if from the whole evidence you find that the father of plaintiff was as much as three-fourths white, then his children are white children, and you will answer the issue Yes. If his father was not as much as three-fourths white, you will answer it No. And a man is three-fourths white when his mother is white and his father was the son of a white woman and black man, or a white man and black woman, or when his father was white and his mother the daughter of a white woman and black man, or of a white man and black woman."

The plaintiff excepted to the refusal to charge as requested, and to the charge as given, and to instructing the jury that the burden of proof was on the plaintiff.

There was a verdict for the defendants, and judgment accordingly, from which plaintiff appealed.

*Mr. L. L. Smith*, for defendants, appellees.
No counsel *contra.*

AVERY, J.: But a single question was raised by the exception to the charge, and that is, whether the Court, in any aspect of the testimony, should have instructed the jury that the children of the plaintiff belonged to the white race, and had a right to insist upon admission into the district school for white children. The inference might have been drawn from the statement of one of the witnesses that the plaintiff's father was a mulatto, while others testified that he was a negro. "All marriages between a white person  *  *  * and a person of negro or Indian descent to the third generation inclusive are void." *The Code*, § 1810. The statute (Laws 1889, ch. 199, § 42) provides, "That in determining the right of any child to attend the white or colored schools, the rule laid down in section 1810 of *The Code* regulating marriages shall be followed." It is manifest that the jury, acting under the instructions given them, must have found from the testimony that Charles Jones was the father of the plaintiff, and was a full-blooded negro. There was no error in the charge of the Court of which the plaintiff could complain. Whether we concede or deny that for the purpose of establishing the right of a person of mixed blood to contract a marriage with a white person, or gain admission into a school for white children, testimony tending to show that the reputed father of his father was only a negro of the half blood is admissible, or that it is competent for either purpose to go behind the presumption that an admitted slave was a full-blooded negro, and attempt to show the exact proportions in which the Caucasian and negro blood were intermingled in his conception, in either event, if the plaintiff's father was in fact a full-blooded negro, as the jury must

have determined that he was, his children would not be beyond the third generation. This Court, in *State* v. *Chavers*, 5 Jones, 11, construed the language of the old statute (Revised Code, ch. 107, § 79), "All persons descended from negro ancestors to the fourth generation inclusive," as classifying with the whites only persons who were removed beyond the fourth, or belonged to the fifth generation. The words used in section 1810, "to the third generation inclusive," must, therefore be construed to prohibit intermarriage of whites with persons who are not beyond the third or in the fourth generation from the pure negro ancestor. The statute. in reference to schools is expressly required to be interpreted in the same way as section 1810 of *The Code* is construed, and it would follow that the plaintiff's children could not rightfully demand admission into the schools for white children without showing that the negro ancestor was more remote than the father of Charles Jones, and that they themselves belonged to the fourth succession from such ancestor. *McMillan* v. *School Committee*, 107 N. C., 609; *State* v. *Watters*, 3 Ired., 455. It will be observed that in the statute creating schools for the Croatan Indians, the exclusion extends to the fourth generation, omitting the word "inclusive," which is synonymous with "the third generation inclusive." If it was material to know whether Charles Jones or a white man was the paternal grandfather of the children, and this was a question in dispute, it was competent to show that their grandmother was living with Jones about nine months before the birth of the plaintiff. While in doubtful cases only an expert would be qualified to testify from the appearance of a person as to the exact extent to which white and negro blood are commingled in his veins, it does not require any peculiar scientific knowledge "to be able to detect the presence of African blood by the color or other physical qualities of the person." *Hopkins* v. *Bowers*, 111 N. C., 175; *State* v. *Jacobs*, 6 Jones, 284. There is

No Error.